ALICE J. McQUADE v. THE GOLDEN RULE.[1]

August 7, 1908.

Nos. 15,717—(219).

### Negligence of Saleswoman—Injury to Third Person.

A saleswoman in a department store, in handling the bundle-carrying apparatus, threw an end of the rope attached thereto out into the aisle and into the face of a customer. Held a question for the jury to determine whether the injury resulting therefrom was caused by the negligent manner in which the apparatus was handled.

Action in the district court for Ramsey county to recover $25,000 for personal injuries alleged to have been caused by the negligence of defendant's employee in operating a bundle carrier. The case was tried before Bunn, J., and a jury which rendered a verdict in favor of plaintiff for $2,000. From an order denying defendant's motion for judgment notwithstanding the verdict or for a new trial, it appealed. Affirmed.

[1] Reported in 117 N. W. 484.

*Durment & Moore,* for appellant.

*H. A. Loughran,* for respondent.

ELLIOTT, J.

The respondent, while in the appellant's store for the purpose of purchasing goods, was struck over the eye by the end of a rope which formed part of the bundle-carrying apparatus. In an action to recover damages for the resulting injuries, based on the alleged negligent manner in which the carrying apparatus was handled by one of the appellant's employees, the plaintiff recovered a verdict for $2,000, and the defendant appealed from an order denying its motion for judgment notwithstanding the verdict or for a new trial.

It is conceded that the respondent was struck by the rope; but appellant contends that it was a mere accident, for which no one is legally responsible, and that the injury was at most slight, and not such as to justify any such verdict as the jury awarded.

The appellant conducts a department store in the city of St. Paul, in which it uses an overhead system of bundle carriers. Wires near the ceiling extend from various parts of the store to a bundle-wrapping station. At different places in the store baskets are suspended under these wires, and over tables and counters. When the baskets are filled they are raised and carried along the wires to the wrapping places. Each basket is operated by means of an elevator rope and a propelling rope working over pulleys. When the parcel is put into the basket, the operator, by pulling on the elevator rope, raises the basket until it reaches the wire. Then by pulling the propelling rope he causes the basket to be kicked, and thereby propelled along the wire to the wrapping station. When the bundle has been wrapped the basket is sent back along the wire to the place from which it came, where it connects with a mechanism to which the elevator cord is attached. The salesman then takes hold of the cord, causes the basket to descend, and the cord goes up. He then, after taking the wrapped parcel out, pulls on the elevator cord and raises the basket out of his way, but not up to the wire. When the basket is at the proper height, the operator, holding the rope so that about two feet of its lower end hangs below his hand, moves or jerks the rope to one side, so as to throw a metal Y or yoke to which the rope is at-

tached under a bracket, which holds the basket suspended at this height until it is released and again lowered for use. The propelling rope hangs over the counter or table, with the lower end about five feet from the floor. The elevator cord hangs down just at the edge of the counter or table. When the basket is at its lowest point the elevator rope reaches to the floor; but when it is at the point where it hangs when the Y is under the bracket, the end is about three feet from the floor.

1. On August 3, 1907, the respondent, Alice J. McQuade, was walking through an aisle between a counter and a table, intending to purchase some article from the table. While the saleswoman was working with the bundle basket, Mrs. McQuade turned her head to the left to look at something on another counter. She was then about three feet from the saleswoman, and, supposing that she was ready to wait on her, turned in the direction just as the saleswoman, in trying to throw the Y under the basket, jerked the elevator rope so that the loose end flew out and struck her on the forehead just over the outer end of the right eye. This rope was of cotton five-eighths of an inch in diameter. It has a brass ferule on the end, and screwed into the end of the rope, and covered entirely thereby, was a screw about an inch and a quarter in length and about three-sixteenths of an inch in diameter. Several inches from the end of the rope a single knot had been tied in the rope. It does not appear with certainty whether it was the ferule or the knot which hit Mrs. McQuade. It is conceded that the carrying apparatus was properly constructed and in good repair. It was such as is in common use. The negligence alleged was the careless manner in which it was handled and operated by the saleswoman.

The appellant was operating a store, to which it invited the public to come and trade, and when people came in response to this invitation it was its duty to exercise reasonable care to see that they were not injured through the improper handling of any of the mechanism by which its business was carried on. The bundle-carrying device was for its use and convenience, and was under its sole and exclusive care and control. It was properly constructed, installed, and maintained, and if properly operated its use could injure no one. It was not contemplated that this rope should be thrown in

the faces of customers who were in their proper places in the aisles, and yet that was what might reasonably be expected to happen under the circumstances. If carefully operated, no such thing could have resulted. But the saleswoman, evidently becoming impatient, jerked the elevator rope so that the loose end flew out and struck the respondent. It was unquestionably a careless and negligent act, and the jury was justified in finding that the defendant was responsible for the result.

2. The appellant contends that the verdict is excessive; but this cannot be, if the respondent's condition, as testified to by her, the physician, and hospital attendants, resulted from the blow which she received in the face. It is hard to see how so. serious a result could have come from what was apparently a slight blow; but the evidence seems reasonably conclusive, and at least made a case for the jury. The blow caused swelling and discoloration on the temple. Mrs. McQuade was of slight physique and apparently nervous temperament. She was a working woman, a stenographer by occupation, and was probably in a physical condition which rendered her susceptible and easily thrown into hysteria. It is unquestionably true that immediately after being struck she was hysterical and sick, and soon after was taken to a hospital, where she remained for about six weeks suffering from neurasthenia. Under the evidence the jury was entitled to believe that this condition (from which she had not fully recovered at the time of the trial) resulted from the blow. The special damages, consisting of physicians, nurses, hospital fees, and drugs, amounted to nearly $500. Upon this evidence, the amount of the verdict cannot be said to be excessive.

3. Several assignments of error are based upon rulings of the trial court on the reception of evidence and the refusal to grant certain requests for instructions to the jury. There was no question of contributory negligence in the case, and the request for an instruction upon that issue was properly denied. So the request to instruct the jury that, as the ills which plaintiff claimed to have suffered were of such a character as cannot be ascertained by an examination by a physician, and must rest largely upon her own statement, and may have resulted from any of numerous causes not connected with the blow, the evidence should be scrutinized closely, and be sufficient

to clearly satisfy the jury, not only that the blow was sufficient to produce the injuries, but that such injuries in fact existed, and resulted from the blow alone, was properly denied. The effect of giving such an instruction would be to cast discredit upon the plaintiff's claim, and suggest that the jury should scrutinize the evidence more carefully than is required in other cases. The issues were clearly defined. The plaintiff's evidence was direct and positive, and was sustained by that of the physician and nurse. The duty of the jury to properly consider and weigh the evidence and be guided thereby was fully stated by the court, and no more was required.

During the trial the plaintiff's counsel made numerous references to the fact that the defendant carried indemnity insurance. It is conceded that under the decisions of this court the fact that the defendant was insured might be referred to for proper purposes; but it is claimed that numerous unnecessary statements were made for the purpose of prejudicing the defendant's case, and that it constituted misconduct on the part of counsel. No effort was made to obtain a ruling from the court, and no request was made for instructions on the matter. The court charged the jury that it was immaterial whether an insurance company was the real defendant. The alleged misconduct of counsel was assigned in the court below as one of the grounds for a new trial. Such matters should be left largely under the control of the trial court, and upon this record we cannot say that it was error to refuse to grant a new trial on that ground.

The assignment based on the ruling which permitted an expert witness to state his opinion as to the permanency of the plaintiff's injuries requires no special consideration. The refusal of the court to allow the defendant to examine a witness called after the case was practically closed was not an abuse of discretion.

There are no errors in the record which require a reversal, and the order of the trial court is therefore affirmed.